## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **CR 25-63-GF-BMM** |
| Plaintiff, | |
| vs. | **ORDER ON DEFENDANT'S MOTION TO SUPPRESS** |
| DION SEAN FIRST, | |
| Defendant. | |

### INTRODUCTION

A Grand Jury Indicted Dion Sean First ("First") with one count of sexual abuse in violation of 18 U.S.C. §§ 1153(a) and 2242(2)(B). (Doc. 1.) First seeks to suppress evidence seized through penile swabs taken without a search warrant. (Doc. 21.) The Government opposes. (Doc. 29.) The Court held a hearing on October 23, 2025. (Doc. 35.)

### BACKGROUND

911 dispatch received a call in the afternoon of January 10, 2024, from Jane Doe stating, "I was just raped, I woke up and felt someone on top of me." (Doc. 29 at 1.) Law enforcement responded to the residence on the Fort Peck Reservation where Jane Doe identified First as the person who allegedly had raped her. (*Id*. at 1-2.) Jane Doe was First's cousin and was visiting the residence. (Id. at 2.) First, Doe,

and their family had been drinking in the morning. (Doc. 22 at 2.)

Tribal law enforcement officers immediately took First to the tribal jail, put him in a jumpsuit, and detained him in a holding facility for a few minutes before meeting with FBI Special Agent Harry Murphy. (Doc. 29 at 2.) A video camera captured the encounter. (*Id.*) Special Agent Murphy can be heard in the video explaining that First was in custody, but that Murphy was not at that time going to provide *Miranda* warnings to First. (Doc. 22 at 2.) Special Agent Murphy informs First he needs to follow a procedure "right now," and that because the nature allegation is sexual assault, a penile swab must be collected. (*Id.*)

Special Agent Murphy explains to First how a penile swab would be conducted. (*Id.* at 3.) An officer would rub a Q-Tip on First's penis to collect DNA material that might belong to somebody else. (*Id.*) Murphy asks First for his consent to perform the penile swab. (*Id.*) First provides consent, saying "I'm okay. yeah." (Doc. 29 at 4.) Murphy follows-up and says, "[y]ou are okay with that?" and First responds "[s]ure." (*Id.*) Murphy clarifies in response to First's question that he is being arrested and not just detained. (*Id.*)

Investigator Stump opens the penile swab kit, reviews the swabbing instructions, asks First to grab the tip of his penis, and then rubs two Q-tips across First's penis. (Doc. 22 at 3.) Tribal law enforcement officers sent the swab to the FBI laboratory for comparison to Jane Doe's SANE examination. (Doc. 29 at 2.)

Officers collected a cheek swab from First the next day. (Doc. 22 at 3-4.)

The FBI determined from the penile swabs that male and female DNA was present on the swabs. (Doc. 29 at 5.) By a likelihood ratio of 470 billion and "very strong support for inclusion," the lab determined that Jane Doe and First are the contributors. (*Id.*)

## LEGAL STANDARD

The Fourth Amendment guarantees the right to be free from unreasonable search and seizure. The Fourth Amendment's "overriding function" protects personal privacy and dignity against unwarranted intrusion by the State. *Schmerber v. California*, 384 U.S. 757, 767 (1966). Searches and seizures conducted without a warrant remain presumptively unreasonable. *Kentucky v. King*, 563 U.S. 452, 459 (2011). The Government may overcome this presumption, however, as "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Id.*

A warrantless search of a person "is reasonable only if it falls within a recognized exception." *Missouri v. McNeely*, 569 U.S. 141, 148 (2013) (citing *United States v. Robinson*, 414 U.S. 218, 224 (1973)). One well recognized exception applies where a person provides valid consent to a search. *United States v. Chan-Jimenez*, 125 F.3d 1324, 1326 (9th Cir. 1997). In order to establish the validity of a consent to search, the government bears the heavy burden of demonstrating that the consent had been freely and voluntarily given. *Schneckloth v.*

*Bustamonte,* 412 U.S. 218, 222 (1973). Whether consent to search was voluntarily given is "to be determined from the totality of all the circumstances." *Id.* at 227. *United States v. Welch,* 4 F.3d 761, 763 (9th Cir.1993), identified several factors to be considered in determining whether consent to search had been voluntary. The following factors tend to show a lack of voluntariness: (1) the person was in custody; (2) the officer had his weapon drawn; (3) the officer failed to administer *Miranda* warnings; (4) the officer did not inform the person of his right to refuse to consent; and (5) the person was told that a search warrant could be obtained. *Chan-Jimenez*, 125 F.3d at 1327. The presence or absence of one of these factors does not prove dispositive of the voluntariness inquiry in any given case. The presence of at least several of the factors support many of the Ninth Circuit's decisions upholding consent as voluntary. *Id*. at n.3.

## ANALYSIS

The Court previously has determined that the collection of a penile swab constitutes a "search" that generally requires a warrant. *United States v. Birdsbill*, No. CR-19-63-GF-BMM, 2020 WL 6202697, at *6 (D. Mont. Oct. 22, 2020). The Government argues that the warrantless collection of the penile swab nonetheless proves reasonable as it falls under the recognized consent exception. (Doc. 29 at 2.) First argues that the alleged consent had not been voluntary. (Doc. 22 at 5.) The Court will address the *Chan-Jimenez* factors to analyze the sufficiency of First's

alleged consent to the collection of the penile swab.

1. First was in custody

The first *Chan-Jimenez* factor analyzes whether the defendant was in custody. First clearly was in custody and handcuffed as seen in the video. Special Agent Murphy clarified that First was in custody in the video of the incident. (Doc. 29 at 4.) Special Agent Murphy explains to First that he is being arrested after First asks if he is just being detained. (*Id.*) A defendant being in custody "does not itself negate voluntariness" with regard to consent to search. *United States v. Shephard*, No. 21-50194, 2024 WL 2103288, at *2 (9th Cir. May 10, 2024), *cert. denied*, 145 S. Ct. 2853 (2025) (citing *United States v. Alfonso*, 759 F.2d 728, 741 (9th Cir. 1985).) "'Custody' is a 'term of art that specifies circumstances that are thought generally to present a serious danger of coercion.'" *Shephard*, No. 21-50194, 2024 WL 2103288, at * 3 (quoting *Howes v. Fields*, 565 U.S. 499, 508–09 (2012)); *see generally*, *Shephard*, No. 21-50194, 2024 WL 2103288, at * 3, J. Mendoz concurrence, joined by J. Berzon). This factor weighs against voluntariness.

2. The officers had their weapons drawn

The officers did not have their weapons drawn during Special Agent Murphy's discussion with First. The Government notes that law enforcement may not bring their guns into the Fort Peck Tribal jail. (Doc. 29 at 7.) "Drawing a weapon is certainly an unequivocal show of authority by a police officer. It is not, however,

the only way a law enforcement officer can use a weapon to convey his authority."
*Chan-Jimenez*, 125 F.3d at 1327. Courts have upheld voluntariness when an officer
had their guns holstered and concealed. *See United States v. Morning,* 64 F.3d 531,
533 (9th Cir.1995) (upholding finding of voluntariness in light of fact that "the
officers did not unholster their guns"); *United States v. Kim,* 25 F.3d 1426, 1432 (9th
Cir.1994) (upholding voluntariness finding in view of fact that officers had their
"guns holstered and concealed"). "In these cases, the officer's gun was holstered or
hidden (or both), and the officer made no use, either implicitly or explicitly, of the
weapon's presence." *Chan-Jimenez*, 125 F.3d at 1327. The fact that the officers had
no guns in this encounter weighs in favor of voluntariness. *Chan-Jimenez*
emphasized, however, that the factor should be analyzed based on the entire
circumstances of the setting. *Id.*

The Government asserts that the video reveals that no indications of coercion
or intimidation. (Doc. 29 at 7). First argues that there were "no less than seven
officers involved in [First's] arrest and detention." (Doc. 32 at 5.) This show of
authority inherent in these numbers could weigh against voluntariness because the
circumstances would lead a reasonable person to view it as a "command" to provide
the penile swab. *Chan-Jimenez*, 125 F.3d at 1327. The fact that several officers were
involved also could prove beneficial for a defendant as it provides for accountability.
In total, this factor weighs in favor of the Government as the officers did not have

6

guns, drawn or holstered, and the demeanor of the officers involved was not particularly intimidating as demonstrated in the video.

### 3. The officer failed to administer *Miranda* warnings

The Court can see in the video that Special Agent Murphy explains to First that he was in custody, but that Murphy was not at that time going to provide *Miranda* warnings to First. (Doc. 22 at 2.) The fact that "a defendant does not receive *Miranda* warnings, on its own, is also not dispositive." *Shephard*, No. 21-50194, 2024 WL 2103288, at *2. The Government asserts that because the officers were not questioning First at the time, it would have been futile to give First his *Miranda* warnings. (Doc. 29 at 8.) Yet, the factor must be given some weight in this analysis. The fact that First was not provided his *Miranda* rights, in combination with the next two factors discussed, weighs against voluntariness.

### 4. The officer failed to inform First of his right to refuse to consent

Special Agent Murphy did not advise First that he could refuse consent. (Doc. 29 at 8.) "An officer is not required to inform the person being searched that [they] ha[ve] a right to refuse consent; doing so simply weighs in favor of finding consent." *United States v. Vongxay*, 594 F.3d 1111, 1120 n.6 (9th Cir. 2010). This factor proves neutral.

### 5. First was not told that a search warrant could be obtained

Special Agent Murphy did not inform First that the officers could obtain a

search warrant. (Doc. 29 at 9.) The Government argues that this warning could be viewed either as a threat designed to coerce, or enhance, voluntariness. (*Id*. citing *Kim,* 25 F.3d at 1426.) *Shephard*, No. 21-50194, 2024 WL 2103288, at *2 reasoned that this analysis "depends on the particular circumstances of the case and thus hinges on whether a suspect is informed about the possibility of a search warrant in a threatening manner." (citing *United States v. Cormier,* 220 F.3d 1103, 1112 (9th Cir. 2000).) Officers never told First that a search warrant could be obtained. Officers also never told First he could refuse consent. *Shephard*'s reasoning is not relevant in this case. *Shephard*, No. 21-50194, 2024 WL 2103288, at *2. This factor proves neutral.

## CONCLUSION

The totality of the circumstances weighs in favor of voluntariness in this case. There are certainly several facts, though, that weigh against voluntariness. First was in custody and in handcuffs when the search occurred. Several officers were involved in First's detention and search. Officers did not provide First with his *Miranda* warnings. Officers did not notify First that he could refuse consent or advise First that a search warrant could be obtained should he deny consent. The entire interaction from when Special Agent Murphy asked First to take a penile swab to the completion of the procedure was just over six minutes. (Doc. 22 at 3.)

By contrast, First gave clear and unequivocal consent to the search. Officers

explained the procedure to First, indicated that it was required because the allegation included sexual assault, and stated that the procedure was necessary to collect DNA material from First's penis that might belong to somebody else. (Doc. 22 at 3.) This information indicates why the procedure is necessary, what the procedure entails, and what are the implications and consequences of the potential outcome.

Murphy asked First for his consent to perform the penile swab. (*Id.*) First provided consent, saying "I'm okay. yeah." (Doc. 29 at 4.) Murphy followed-up and asked, "[y]ou are okay with that?" and First responded "[s]ure." Murphy provided First with the opportunity to deny consent twice and twice First asserted that he did not object to the procedure. The Court might feel differently if First showed hesitation or expressed a desire to ask more questions about the procedure but First did not. First, instead, gave clear consent and now that he regrets that choice, he is attempting to backtrack. The Court's job is to ensure that First's consent was not the result of express or implied duress or coercion. *Schneckloth*, 412 U.S. at 248-49.

The Court thinks this case presents a close call but the totality of the circumstances demonstrate that First freely and voluntarily consented to the procedure. *Chan-Jimenez*, 125 F.3d at 1327. The Court counsels law enforcement that in the future, situations such as this, would be less ambiguous should officers obtain a warrant or inform defendants that they have a right to refuse consent. *See United States v. Mendenhall*, 446 U.S. 544, 559 (1980) (holding that "the fact that

the officers themselves informed the [defendant] that she was free to withhold her consent substantially lessened the probability that their conduct could reasonably have appeared to her to be coercive.) The Court will deny First's motion to suppress.

Accordingly, **IT IS HEREBY ORDERED** that First's Motion to Suppress (Doc. 21.) is **DENIED** in accordance with the above order**.**

**DATED** this 4th day of November, 2025.

_____

Brian Morris, Chief District Judge
United States District Court